IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 18, 2004

### BILLY DAVID GRUBB v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Knox County**
**No. 75249     Ray L. Jenkins, Judge**

_____

**No. E2003-02189-CCA-R3-CD - Filed June 24, 2004**

_____

The petitioner, Billy David Grubb, pled guilty in 2001 to first degree premeditated murder and especially aggravated burglary for which he was sentenced, respectively, to consecutive sentences of life without parole and twelve years. Subsequently, he filed a timely petition for post-conviction relief, which was amended by counsel, claiming, *inter alia*, that trial counsel had been ineffective by not seeking a pretrial mental evaluation. Following an evidentiary hearing, the post-conviction court dismissed the petition. After review, we affirm the dismissal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOE G. RILEY, J., joined.

Albert J. Newman, Jr., Knoxville, Tennessee, for the appellant, Billy David Grubb.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Zane Scarlett, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

At the petitioner's guilty plea submission hearing, the State advised the court of the facts it was prepared to prove had the case gone to trial:

> If called to testify, your Honor, those persons listed on the indictment would testify that on March the 5th of 2001, Marguerite Latham did reside at 1929 Maryland Avenue. She was acquainted

with [the petitioner], who lived on Massachusetts Avenue here in Knox County, Tennessee.

On that date, [the petitioner] knocked on her door and asked to use the phone, and she went to get the phone for him. She allowed him into the home and handed him the phone. He then asked for a glass of water; and when she went to get the glass of water from the refrigerator, she recalls that he struck her. She was assaulted numerous times by the [petitioner] and was able to tell Investigator Loeffler of the Knoxville Police Department that she remembers at one time he was on top of her choking her. She lost consciousness and . . . did not know how the [petitioner] left the house. She did wake up and call 911, because she was unable to get up off of the floor.

She was taken to U. T. Hospital where she was treated for the injuries sustained in this assault and where she ultimately died 10 days later.

The Police Department began investigating this and discovered that certain items were missing from the residence, including the victim's car and some jewelry and other personal items of hers.

The investigation led to them looking for [the petitioner], and three days later, Detectives Price, Marcum, and Claiborne of the Knoxville Police Department went to Asheville, North Carolina, acting on a tip. Once there, they found [the petitioner], who they recognized, and served on him the arrest warrants.

They talked to the persons with whom he was staying and they were allowed to search the room in which he was staying and recovered certain personal items that belonged to Ms. Latham. The clothes that he was wearing when the attack occurred were confiscated as well.

In addition, he gave a detailed, three-page confession to the detectives from Knoxville, Tennessee, admitting what he had done and that he had stolen items from her, and that he had fled to North Carolina to avoid detection. He also told them where he had thrown the keys to the car, which he had stolen on the day of the attack, and those were recovered.

Dr. Sandra Elkins would testify that Ms. Latham was 78 years old at the time of the attack. She sustained multiple blunt-force injuries, was hospitalized and died as a result on March 15th. In addition to the blunt-force injuries to the head and chest, the autopsy revealed neck injuries consistent with attempted strangulation during the assault.

It would be further proof that the assault and the death occurred here in Knox County, Tennessee, and that [the petitioner] was identified not only by Ms. Latham, but by his confession.

Both the petitioner and his trial counsel testified at the evidentiary hearing. Post-conviction counsel explained that the petitioner's claim of ineffective assistance of counsel was based upon his belief "that before he . . . entered his plea that he should have had a psychiatric or mental evaluation, . . . that's the only thing that he's really complaining about."

At the hearing, the petitioner testified that he was twenty-eight years old, had attended school to "[a]bout the seventh" grade, and could "[b]arely" read and write. He said that he had been "released from a mental institution three days before – prior before the murder even happened." He said he "had [a] mental history since [he] was nine years old [and had] been in just about any mental institution there are." He had told trial counsel that he wanted to be examined. He testified that had he been told he was not facing the death penalty, he "would have took it to trial" after he had an "evaluation, but [he] was never evaluated."

On cross-examination, the petitioner said that he had been hospitalized as a "[p]aranoid schizophrenic, manic depressant" and had been "on medication and everything." He said he had gone to the hospital because he "was strung out on coke" and left the hospital after ten days because that was all he could afford. He said that, at the time of the murder, he had been on Paxil, Buspar, and "a couple of others." As to his complaint against trial counsel, the petitioner said that "if he didn't tell me I was – threatened me with the death, I would have never took [sic] the plea in the first place." According to the petitioner, he did not "premeditate" killing the victim, "[i]t was just an accident[,] it happened." He said if trial counsel had properly represented him, he did not believe he "would have ended up with life without possibility. [He] might have ended up with life with, but not without." As to why he had pled guilty, the petitioner said that "[t]he death penalty was more – and my family not wanting me to go and go take the chance of getting the death penalty. They would rather see me live and go through it, through prison again." He said he pled guilty "[b]efore I knew what I knew [sic] now." Had his trial counsel been effective, according to the petitioner, he would have come "out a little bit better than life without the possibility of parole, of ever getting back on the streets, if [he had] took [sic] it to trial with a good counsel."

The petitioner's trial counsel testified that, in his opinion, the petitioner had no basis for presenting, as a defense, a claim of insanity or diminished mental capacity. He described his knowledge of the petitioner's mental history:

[The petitioner] has been in mental facilities off and on since he was about nine years old. He's been evaluated since he was about four or five years old. He has, that I can find, nine different evaluations, none of which ever found him to have an axis one definition that would – diagnosis that qualify him for a mental status defense. He's never been diagnosed as paranoid schizophrenic by anyone, ever.

Counsel recounted his gathering of the petitioner's mental records:

I have thousands of pages of mental–medical records from lakeshore and Peninsula, and Peninsula Lighthouse, Overlook; Dr. Charles Rodwell, Dr. Randall May, Jackson Academy. I got his school records from the Knox County archives. I've got his Taft Youth Center records, John Tarlton records, Highland Retreat records, Horizon Medical Center records, his special ed records from schools, all of his TDOC records, his Mountain View Developmental Center record. We went through all of that.

I did have a doctor at the school social work, Dave Patterson, working with me in this case, and Dave Patterson assimilated all those records and submitted to me about a 30-page report on [the petitioner], explaining what those were, what all the diagnoses were and where that left us from the standpoint of a mental status defense.

Counsel explained why he had not believed that a mental status defense was available to the petitioner:

[U]ntil he was 18, [the petitioner] was always diagnosed with a conduct disorder. And as you know, a conduct disorder is oftentimes a precursor for an adult antisocial conduct disorder diagnosis. Antisocial conduct disorder is not a disorder that would allow you to rely on a defense of insanity.

When he became an adult, nobody ever labeled him as antisocial, although his psychological records all suggest that he is probably antisocial. But, as you know, mental health providers hesitate to label someone as antisocial.

They talked about depression that he had and . . . certainly, [the petitioner] had a very, very, very difficult life and had serious, serious problems of addiction. And [the petitioner] never had any sort of an axis one diagnosis ever that would afford him a mental status defense.

-4-

Explaining why a death penalty notice had not been filed in the matter, trial counsel said that the State's policy was to give a defendant "an opportunity to avoid the death penalty." He said that if a defendant turned down such an offer, and the State then filed a notice it would be seeking the death penalty, the State was "very slow to come off the notice." He said the State told him, "[I]f we don't work this case out, [the State was] going to file a death notice." Counsel said that he explained this to the petitioner and had "several notes from [the petitioner] saying if I go to trial, I'm going to get death, and he wanted to plead guilty."

On cross-examination, trial counsel said he brought the petitioner's file, which consisted of two bankers boxes, to the hearing. His records showed that he had met with the petitioner "around 20 different times" while representing him, seeing him "every day" for a period. He said it had been the petitioner's decision to plead guilty. As for the prospects had the case gone to trial, counsel said the petitioner "didn't have a defense."

Counsel said that the petitioner had been released from the hospital about a month prior to the killing, not three days as the petitioner had testified. He said the petitioner's problem had been "cocaine addiction" and that "when [the petitioner] was in trouble, [the petitioner] would call [the hospital] and tell them that he was going to commit suicide," resulting in "a suicide admission." Counsel said that when the petitioner was admitted to the hospital prior to the killing, "they didn't see anything that appeared to be of a psychotic nature, other than some depression." His discharge summary stated "that he suffered from cannabis and cocaine abuse, and they gave no axis to a diagnosis."

At the conclusion of the hearing, the post-conviction court made oral findings of fact and conclusions of law in dismissing the petition:

> [The petitioner's] main complaint is that in spite of a history of mental examinations and illnesses throughout his life, since the age of nine and an earlier examination, that he was not examined as a possible defense to the death penalty, although he freely admits that he did the act.
>
> He claims that not only was he paranoid schizophrenic, but he was manic depressive. That he was "not too good with a memory."
>
> Even his family advised him to enter a plea to avoid the death penalty, although [the petitioner] indicates that he would rather have received the death penalty than serve an extended period of time in the penitentiary without parole.
>
> [Trial counsel], the Public Defender for Knox County, Tennessee, Sixth District, testified that in his Office, to his knowledge, he was the only attorney who represented [the petitioner].

-5-

He obtained all of the records of the defendant/petitioner, went through them. And the only thing that he could find was a conduct disorder. That there was no diagnosis through all those years, some two thousand pages of records, that would have allowed a status defense.

That he explained the situation to [the petitioner], and it was his desire to enter a plea.

Now, the effective assistance of counsel is based on the Tennessee case of Baxter v. Rose, 523 S.W.2d 930, and Strickland v. Washington, 466 U.S. 668. Nowhere does the testimony rise to the violation of any of [the petitioner's] rights. In fact, he carries the burden of proving his claim by clear and convincing evidence, TCA 40-30-110(f).

This Court can see no violation of the rights of the petitioner/defendant, and, accordingly, the petition is dismissed.

## ANALYSIS

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2003). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

We note that when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and weight of a jury verdict, and this court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-

guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999), "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

Since the petitioner pled guilty to the charges against him, there were additional required showings, which he failed to make, to establish that he was entitled to relief. "In cases involving a guilty plea or plea of nolo contendere, the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998) (citing Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985); Bankston v. State, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991)). Hill explains the showing of prejudice which must be made by a petitioner who entered a guilty plea:

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

474 U.S. at 59, 106 S. Ct. at 370.

Initially, we note the post-conviction court announced its findings at the conclusion of the hearing, and there are no written findings in the technical record. Following a post-conviction hearing, a trial court is required to enter written findings of fact and conclusions of law addressing all grounds for relief. See Tenn. Code Ann. § 40-30-111(b) (2003); Tenn. Sup. Ct. R. 28, § 9(A). Nevertheless, the trial court's oral pronouncement of its findings from the bench does not necessarily require reversal and can be harmless error. See State v. Higgins, 729 S.W.2d 288, 290-91 (Tenn. Crim. App. 1987). Here, the post-conviction court's findings and conclusions are sufficiently comprehensive to allow for proper appellate review; hence, the failure to enter written findings and conclusions was harmless. Tenn. R. App. P. 36(b).

Although the petitioner's hearing testimony was somewhat contradictory, his claim appears to be that, had his trial attorney secured a mental evaluation prior to the resolution of his case, he somehow would be serving a lesser sentence than life without parole. However, his trial attorney testified as to the extensive preparation he had invested in preparing the matter, including many meetings with the petitioner and amassing a large volume of his mental health records. It was the attorney's belief that no basis existed for a mental incapacity defense, and the record reflects that he had substantial information as to the petitioner's mental history prior to making this determination. The petitioner presented no proof that he would have benefitted in any fashion from trial counsel's seeking a mental evaluation prior to the disposition of his case. See Black, 794 S.W.2d at 758 (trial counsel not ineffective for failing to file a motion for severance when it "would have been an effort in futility"). The post-conviction court found both that the petitioner had failed to establish that his trial counsel had been ineffective and that he would not have pled guilty absent counsel's alleged mistakes. The record in this matter, including the transcript of the petitioner's pleas of guilty, supports these determinations by the post-conviction court.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's dismissal of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE